CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
2/3/2021
JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| LUKE W.[1], | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 6:19cv00058 |
| | ) |
| ANDREW SAUL, | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## REPORT AND RECOMMENDATION

Plaintiff Luke W. ("Luke") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381-1383f. Luke alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) assess his mental impairments; (2) determine his RFC using a function by function analysis; and (3) assess his allegations regarding his symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 15), and **DENYING** Luke's Motion for Summary Judgment (Dkt. 13).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

support the Commissioner's conclusion that Luke failed to demonstrate that he was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Luke filed for DIB and SSI in May and November 2015, respectively, claiming his disability began on January 1, 2009, due to Crohn's disease, arthritis, anemia, depression, and attention deficit disorder ("ADD").[3] R. 209, 226, 229. Luke's date last insured was June 30,

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] In his DIB claim, Luke initially alleged his disability began on April 1, 2012, but later amended his alleged onset date to January 1, 2009, to match his SSI claim. R. 12, 201, 209.

2010; thus he must show that his disability began on or before this date and existed for twelve continuous months to receive DIB. R. 12, 226; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Luke's applications at the initial and reconsideration levels of administrative review. R. 58–64, 66–77, 78–89, 90–107. On June 13, 2018, ALJ Thomas Erwin held a hearing to consider Luke's claims for DIB and SSI. R. 35–57. Counsel represented Luke at the hearing, which included testimony from vocational expert Robert Jackson. On September 25, 2018, The ALJ entered his decision analyzing Luke's claims under the familiar five-step process[4] and denying his claim for benefits.[5] R. 12–29.

The ALJ found that Luke was insured at the time of the alleged disability onset and that he suffered from the severe impairments of Crohn's disease, inflammatory arthritis, ankylosing splondylitis / sacroiliitis, and mood disorder with possible ADD.[6] R. 15. The ALJ determined that these impairments, either individually or in combination did not meet or medically equal a listed impairment. Id. The ALJ specifically considered listing 1.02 (major joint dysfunction), 1.04 (disorders of the spine), 5.06 (inflammatory bowel disease), 14.09 (inflammatory arthritis), 12.04 (depressive, bipolar, and related disorders), and 12.11 (neurodevelopmental disorders). R. 15–16. The ALJ found that regarding his mental impairments, Luke had moderate limitations

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[5] Luke was 20 years old on the date last insured, and 28 years old on the date of the ALJ's decision, making him a younger person under the Act. R. 19, 78.

[6] Ankylosing spondylitis is a type of arthritis that causes inflammation in certain parts of the spine. See https://www.niams.nih.gov/health-topics/ankylosing-spondylitis

in understanding, remembering, and applying information, interacting with others, and concentrating, persisting, or maintaining pace, and mild limitation in adapting or managing oneself. R. 16–18.

The ALJ concluded that Luke retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 18. Specifically, Luke can only occasionally climb, balance, stoop, kneel, crouch, and crawl, and can have only occasional exposure to extreme cold or hazards such as hazardous machinery and unprotected heights. Id. Luke can perform simple, routine tasks, in a job without strict production rate or pace requirements, and have no more than occasional interaction with coworkers. Id. The ALJ determined that Luke has no past relevant work, but could perform jobs that exist in significant numbers in the national economy, such as cleaner and marker. R. 28. Thus, the ALJ determined that Luke was not disabled. R. 29. Luke appealed the ALJ's decision and the Appeals Council denied his request for review on July 24, 2019. R. 1–4.

## ANALYSIS

Luke alleges that the ALJ failed to properly assess his mental impairments, determine his RFC using a function by function analysis, and assess his allegations regarding his symptoms.

**A. Medical History Overview**

1. Medical Treatment

Luke was diagnosed with Crohn's disease in 2008, shortly prior to his alleged onset date. R. 323. Luke began seeing treating physician, Donald Steinweg, M.D., in June 2009, and Dr. Steinweg noted his Crohn's disease was stable while on Lortab. R. 322. Luke followed up with Dr. Steinweg periodically in 2009, with complaints including joint pain, swelling, and depression. R. 328, 330. At a follow-up in May 2010, Luke indicated he no longer had joint pain

4

and was not taking pain medication, but was taking Humira for his Crohn's, and reported depression. R. 347. Following complaints of a skin rash in 2011, Luke did not seek any medical treatment until May 2015. R. 387–90, 393. At the May 2015 appointment, Luke complained of daily joint pain, and generally one bowel movement a day with no blood, but with unpredictable bad days of 5-7 bowel movements. R. 394. Dr. Steinweg noted he had "not seen Luke in four years" and that Luke had been off his medications for three years, after he "got burned out from seeing doctors and stopped [Humira] in 2011." Id. Dr. Steinweg assessed improved depression, even with no medications, stable Crohn's disease, arthritis, and anemia. R. 396. At a July 2016 follow-up with Dr. Steinweg, Luke reported some recent depression, but that he's "doing great now" with some positive life changes, including becoming more engaged with his religion, and getting rid of his video games. R. 860.

In January 2016, Dr. Steinweig referred Luke for a rheumatology consultation to address his complaints of back pain, and the doctor recommended restarting Humira. R. 571–80. The Humira helped his symptoms; however, Luke stopped after four doses, "because he wanted to try stretching and dietary changes and regular physical activity first." R. 716. In April 2018, Luke had a visit to establish care with a new primary care provider, with complaints of depression and back pain, indicating he had not seen his last rheumatologist since 2016, but "has not had any major problems [with Crohn's] over the last few years." R. 876. He was assessed with rheumatoid arthritis, ankylosing spondylitis, Crohn's disease, without complication, and depression, unspecified. R. 878. Luke was offered referrals for rheumatology and for counseling but "declined for now." R. 878.

    2. Medical Opinions

In August 2016, Marvin A. Gardner, Jr., Ph.D., performed a consultative psychological

5

examination. R. 827–32. Dr. Gardner provided a mental source statement indicating that Luke could perform simple and repetitive work activities, maintain regular attendance in the workplace, perform work activities on a consistent basis, and complete a normal workday or workweek without interruptions from his mental impairments. R. 832. Dr. Gardner found a moderate impairment in social interaction, found he could interact with the general public, but would do best working with minimal interaction with coworkers. Id. The ALJ gave Dr. Gardner's opinion significant weight. R. 25.

State agency physician Robert McGuffin, M.D. in August 2016 reviewed the record and found Luke capable of a limited range of light work, with certain postural limitations but no manipulative or environmental limitations.[7] R. 102–103. The ALJ gave Dr. McGuffin's opinion significant weight. R. 24. State agency psychologist Alan Entin, Ph.D. also reviewed the record in August 2016 and noted a number of mental limitations, but concluded that Luke "remains capable of understanding and remembering instructions, concentrating, persisting at work duties to completion and adapting to changing activities within the workplace." R. 104. The ALJ gave Dr. Entin's opinion some weight. R. 26.[8]

**B. Mental Impairments under SSR 96-8P**

Luke argues that the ALJ failed to properly assess his mental impairments as required by SSR 96-8P.  See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR

---

[7] In April 2016, the state agency doctor determined there was insufficient evidence to make a determination about disability. R. 76.

[8] Dr. Steinweg wrote a letter in May 2015 stating, "You are under my care for several medical conditions that make it impossible for you to hold a job. Your Crohn's disease and related arthritis significantly limit your ability to work." R. 398. The ALJ gave this letter reduced weight because it was "not well quantified or supported" and not fully consistent with his own treatment notes R. 26. Dr. Steinweg wrote a second letter in August 2015, also in support of his alleged disability. R. 508. The ALJ likewise gave this letter reduced weight, specifying how it was inconsistent with his own treatment notes. R. 27. Luke's brief sets forth no arguments regarding the ALJ's weighing or analysis of Dr. Steinweg's opinions as set forth in these letters.

96-8P (S.S.A. July 2, 1996). Specifically, Luke asserts that the ALJ failed to properly consider his moderate limitations in concentration, persistence, or pace and interacting with others by "only address[ing] the skill level of work and . . . not [Luke's] ability to sustain work activity over the course of an eight-hour workday."[9] Pl.'s Br. at 16, Dkt. 14. Also, Luke claims the ALJ "failed to explain what he meant by strict production rate or pace requirements." Id.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 U.S. Dist. LEXIS 132972, at *15-16, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe v. Colvin, 826 F.3d 176, 189, (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

---

[9] Luke also states that the ALJ failed to explain how Luke's moderate limitations in understanding, remembering, or applying information are accommodated by the ALJ's RFC. However, Luke provides no argument to specifically support this claim. In any event, I find that the ALJ adequately explained and accommodated Luke's moderate limitations in understanding, remembering, or applying information. Specifically, the ALJ acknowledged Luke's testimony regarding his poor memory, as well as some memory deficits shown during childhood tests and the consultative exam. R. 16. However, the ALJ noted Luke's memory was "grossly intact" during multiple appointments, his ability to think abstractly and his general fund of knowledge were normal, and his activities of daily living included "a number of activities requiring the use of reason and judgment," and concluded that Luke retained the capacity to perform simple, routine tasks. Id. Additionally, the ALJ relied on Dr. Entin, who found Luke was capable of understanding and remembering instructions, and Dr. Gardner, who found he was "able to perform simple and repetitive work tasks" and was of normal intelligence, and able to perform work activities without special or additional supervision. R. 24–25.

7

In Shinaberry v. Saul, the Fourth Circuit clarifies that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)). However, Mascio does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Id. In contrast, Shinaberry highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." Id. (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). Shinaberry further confirms that Mascio does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC, but instead underscores the ALJ's duty to adequately review the evidence and explain the decision. See also Monroe, 826 F.3d 176 (emphasizing that the ALJ must provide a sound basis for his ruling, including discussing what evidence he found credible and specifically applying the law to the record).

This is not a situation like Mascio, where the ALJ summarily concluded that a limitation to simple, unskilled work accounts for the claimant's moderate impairment in concentration, persistence and pace without further analysis. Unlike the claimant in Mascio, the medical evidence here supports the ALJ's conclusion that, despite his moderate limitations in concentration, persistence, or pace, Luke is capable of performing the basic mental demands of light work, with the specified accommodations. Further, here, the ALJ explained why Luke's

8

moderate limitations in concentration, persistence, or pace, interacting with others, and understanding, remembering, or applying information, did not translate into a limitation in the RFC beyond "simple, routine tasks, in a job without strict production rate or pace requirements[, and] no more than occasional interaction with coworkers." R. 18.

As a preliminary matter, I find that the ALJ adequately explained what he meant by "a job without strict production rate or pace requirements." R. 18. This case must be distinguished from Thomas v. Berryhill, where the Court of Appeals held that the ALJ failed to adequately explain her conclusions regarding the claimant's mental impairments, including by limiting the claimant to no work "requiring a production rate or demand pace" but failing to explain the meaning of those terms. 916 F.3d 307, 312 (4th Cir. 2019), as amended (Feb. 22, 2019). The Thomas court stated:

> [W]hile the ALJ stated that Thomas could not perform work "requiring a production rate or demand pace," she did not give us enough information to understand what those terms mean. That makes it difficult, if not impossible, for us to assess whether their inclusion in Thomas's RFC is supported by substantial evidence

Id.; See also Perry v. Berryhill, 765 Fed. App'x 869, 872 (4th Cir. 2019) (unpublished) (concluding that, because the ALJ did not provide an explanation for the term "non-production oriented work setting" in assessing the RFC, she failed to build the required "logical bridge" between the evidence and her conclusion) (citation omitted). Unlike in Thomas and Perry, the ALJ here explained the term "strict production rate or pace requirements." While questioning the vocational expert, the ALJ stated, "And stress seems to be an issue, so let's eliminate those jobs that have strict production or pace requirements, whether that's keeping up with a factory assembly line or just being in a job where you have to make a certain number of objects every hour or every day." R. 55. Accordingly, I am not left to guess what the ALJ meant when he included the limitation of no "strict production rate or pace requirements" in his RFC, he

9

explained it during the hearing to both Luke and the vocational expert. Thus, the jobs offered by the vocational expert excluded those where Luke would have to keep up with an assembly line or make a certain number of objects in an hour. see e.g. Nelson v. Saul, No. 4:18-CV-163-D, 2019 WL 4748028, at *5 (E.D.N.C. Aug. 29, 2019), report and recommendation adopted, No. 4:18-CV-163-D, 2019 WL 4747048 (E.D.N.C. Sept. 27, 2019) (distinguishing Perry and Thomas because this "ALJ offered an explanation for what he meant by 'no production-rate or paced-rate work'—the ALJ wrote in a parenthetical, 'such as would be done on an assembly line.'").

Second, contrary to Luke's argument, the ALJ adequately supported his finding that Luke could sustain his simple, routine tasks over a normal workday, and accounted for Luke's moderate impairments in his hypothetical questions to the VE and the RFC finding in his ruling. The ALJ found that Luke had moderate impairments in concentration, persistence, or pace, noting that "this area of functioning concerns actions that demonstrate the ability to focus attention on work activities and stay on task at a sustained rate." R. 17. While the ALJ acknowledged that Luke's "mood-related and attentional symptoms" would interfere in this domain somewhat, he concluded that his moderate limitations would not prevent Luke from working, and that Luke was capable of performing the basic mental demands of unskilled work, specifically "simple, routine tasks, in a job without strict production rate or pace requirements." R. 17, 23. In fact, the ALJ specifically noted that the RFC "imposes additional limitations with respect to pace and production requirements based on [Luke's] testimony that stressful situations tend to exacerbate both his mental health and his GI symptoms." R. 25. The ALJ also acknowledged Luke's testimony that his attention was "variable" but emphasized that his cognitive functioning tests during the consultative examination in 2016 "did not reveal any difficulties" with attention, and that on exam, medical providers "typically described him as

10

alert and oriented, without mention of any unusual distractibility, inattention, or slowness." Id. The ALJ also referenced Luke's activities of daily living, including working part-time, driving, doing chores, and playing video games, which he characterized as "requir[ing] some capability in this domain." Id. The ALJ gave great weight to consultative examiner, Dr. Gardner's, assessment, including that Luke could perform simple and repetitive work tasks and "complete a normal workday or workweek without interruptions resulting from his psychiatric condition." R. 25. Likewise, the ALJ gave some weight to the state agency psychologist, Dr. Entin, including his conclusion that Luke "remains capable of . . . concentrating, persisting at work duties to completion." R. 25. Thus, contrary to Luke's argument that Dr. Entin and Dr. Gardner "did not address [his] ability to stay on task," as the ALJ noted, both found Luke could stay on task on a sustained basis, i.e., he could complete a work week without interruption from his psychiatric limitations, and complete his work tasks. Pl.'s Br. at 21, Dkt. 14; R. 25.

      Luke also argues that the ALJ failed to explain how the RFC accommodates his moderate limitations in interacting with others. In this domain, the ALJ acknowledged Luke's testimony regarding that he "self-isolates from others at times" and can feel "out of place around other people because they expect too much of me . . . I get too involved with people." R. 17. However, the ALJ noted that, despite "these subjective complaints" the medical records show Luke "came across as cooperative and appropriate" during encounters, with providers even noting a "friendly manner" and "good smile frequency." R. 17. The ALJ also emphasized that Luke reported having a few friends, regularly attending church meetings, and shopping for groceries. Thus, the ALJ explained that the evidence suggested no more than a moderate limitation in this domain, and thus, a limitation of no more than occasional interaction with coworkers was appropriate. Id. The ALJ gave significant weight to Dr. Gardner, who indicated Luke "would do best with

11

minimal interaction with coworkers," however, the ALJ did not adopt "limited contact with the general public" as suggested by Dr. Entin. The ALJ explained this decision, writing that "the evidence does not establish any significant limitation in public interaction." R. 26. In support of the decision to limit contact with coworkers, but not the general public, the ALJ referenced Luke's testimony that he would sometimes "go door to door to talk to people on behalf of his church" and concluded he "subjectively seemed more bothered with his interactions with coworkers." Id.

Here, the ALJ's reasoning rests on the opinions of the consultative examiner and state agency physicians, and a detailed consideration of the record evidence, and this court is not "left to guess about how the ALJ arrived at [her] conclusions." Mascio, 780 F.3d at 637. As such, I conclude that substantial evidence supports the ALJ's conclusions regarding Luke's RFC.

### C. Physical RFC and Function-by-Function Analysis

Luke argues that the ALJ's physical RFC findings are not supported by substantial evidence, specifically regarding "whether [his] impairments would cause him to experience episodes of pain or diarrhea necessitating breaks and how often those breaks would occur." Pl.'s Br. at 29, Dkt. 14. Luke asserts the ALJ failed to account for "the unpredictable nature of his Crohn's disease, pain, and anemia. Id. However, Luke does not point to any specific records to support a need for additional breaks, other than would be adequately accommodated by standard employer-provided breaks.[10] Luke's argument amounts to a disagreement with the ALJ's RFC determination and essentially ask the court to reweigh the evidence.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental

---

[10] At the hearing, the vocational expert confirmed that the jobs identified would provide for restroom breaks approximately every two hours. R. 55.

12

impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p, and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to

13

guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Luke's medical records, the medical opinions, Luke's hearing testimony, and the ALJ's conclusions. R. 19–27. The ALJ's opinion explicitly specifies how the limitations in the RFC correlate with his severe impairments.

Contrary to Luke's claim that the ALJ failed to account for his claimed potential need for additional breaks, the ALJ specifically found that the RFC limitations concerning pace and production requirements adequately accommodate his GI symptoms, and Luke's need for bathroom breaks would be accommodated by standard employer-provided breaks. R. 22. In support, the ALJ noted throughout his opinion that Luke's Crohn's disease had been mild or "relatively stable in recent years," he currently takes no medications for his Crohn's disease, and he had a complete gap in medical treatment from 2011 through 2015, and again in 2017. R. 15, 19, 22. Concerning his joint pain, the ALJ specifically noted Luke's treatment gaps, conservative treatment course, reports of improvement, and decision to pursue more conservative care rather than Humira, in determining that the "exertional, postural, and environmental limitations adequately accommodate the reasonable limiting effects of [Luke's] alleged joint pain and inflammation." R. 22. Finally, concerning his anemia, the ALJ noted the large gap in medical treatment, normal findings from blood tests in 2015 and 2018, and an absence of reports of significant fatigue in his treatment notes, in determining that the exertional and pace limitations also accommodate Luke's fatigue. R. 23.

Accordingly, I recommend finding that substantial evidence supports the ALJ's RFC determination.

**D. Subjective Allegations**

Luke argues that the ALJ's assessment of his allegations is not supported by substantial evidence. Specifically, Luke complains that the ALJ ignored evidence that he "reported to his doctors that his Crohn's disease was symptomatic on an intermittent basis," and his impairments were unpredictable and included intermittent bad days. Pl's. Br. at 30–31, Dkt. 14. Luke also asserts that the activities of daily living the ALJ referenced to support his finding that Luke is not disabled do not actually show he is capable of completing an eight-hour workday, including driving, doing some chores, cooking, attending church, and spending time with friends. Luke points to his own testimony that he alternated between sitting and standing during his weekly church attendance, has to lie down during the day periodically, and can only do chores sporadically. Finally, Luke argues he did not take Humira or other medications for long stretches because of both financial concerns and effectiveness issues.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims,[11] SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).[12] First, the ALJ looks for objective medical evidence showing a condition that could reasonably

---

[11] In March 2016, the Social Security Administration superseded the language of SSR 96-7P when it ruled in SSR 16-3P that "credibility" is not appropriate terminology to be used in determining benefits. See Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P (S.S.A. Mar. 16, 2016) (effective March 28, 2016).

[12] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

produce the alleged symptoms, such as pain.[13] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

The ALJ's opinion includes a discussion of Luke's medical history, along with Luke's own allegations, and the ALJ adequately supported his finding that Luke's allegations were not entirely consistent with the medical evidence and other evidence in the record. The ALJ noted Luke's testimony regarding his limitations, including his joint pain, Crohn's disease and GI symptoms, and found Crohn's disease, inflammatory arthritis, and ankylosing spondylitis/sacroiliitis among Luke's severe impairments. Indeed, contrary to Luke's assertions that the ALJ ignored evidence regarding his symptoms, including the intermittent nature of his Crohn's disease and joint pain, the ALJ specifically noted Luke's testimony that his "symptoms are unpredictable" and his "GI symptoms continue to flare up periodically." R. 19.

The ALJ wrote:

Luke's medically determinable impairments could be reasonably be expected to cause the [] alleged symptoms; however, [Luke's] statements concerning the intensity, persistence,

---

[13] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

> and limiting effects of these symptoms are not entirely consistent with the objective medical evidence and other evidence in the record . . . . Review of the entire record discloses a number of evidentiary inconsistencies showing a lesser degree of severity and limitations than generally alleged . . . .

R. 21. In support, the ALJ carefully addressed Luke's allegations regarding his impairments, each in turn. Regarding Luke's joint pain and inflammation, the ALJ acknowledged that Luke found his "migrating joint pain" was one of his most problematic issues, but noted that his treatment has been "relatively conservative and characterized by lengthy gaps," as well as reports of improvement when he complied with treatment recommendations. R. 21. The ALJ cites several examples of Luke's reporting improvement while taking Humira.[14] Additionally, the ALJ reports that the December 2016 note where Luke indicated he wanted to continue with conservative treatment such as stretching, rather than restart Humira, "contain[ed] no mention of financial barriers being part of [Luke's] decision." R. 21.  The ALJ noted that objective findings, including physical exams in 2010 and 2011, and after a long treatment gap, in 2016 showed no joint tenderness or swelling, and generally good range of motion. R. 21–22. In the same vein, the ALJ also acknowledged Luke's GI symptoms and Crohn's disease as a severe impairment, and accommodated his symptoms in the RFC, but noted his long gaps in treatment, with "virtually no medical care from December 2011 to April 2015, or for the entirety of 2017" and multiple appointments where he reported mild or stable GI symptoms, and showed normal findings on exam, "apart from a few scattered instances of tenderness." R. 22.  The ALJ also found that evidence regarding Luke's activities of daily living "further supports the conclusion" that he is capable of a limited range of light work. R. 24.

---

[14] In support, the ALJ cites to specific medical appointments including from December 2010, February 2011, and September 2011, reporting no joint pain, and "improved on Humira." R. 374, 384, 390.

17

Luke also points <u>Brown</u>, 873 F.3d 251, to support his argument that the ALJ does not explain how his various activities of daily living show that he is capable of completing a full workday. Pl.'s Br. at 31, Dkt. No. 14. However, this case is distinguished from <u>Brown</u>, where the Fourth Circuit concluded that the ALJ had committed multiple errors, including failing to acknowledge the extent of the daily activities of living, writing:

> With respect to the first reason for the adverse credibility finding, the ALJ noted that Brown testified to daily activities of living that included "cooking, driving, doing laundry, collecting coins, attending church and shopping." <u>See</u> Second ALJ Decision 11. The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities depicted by Brown—showed that he could persist through an eight-hour workday.

873 F.3d at 263. Here, unlike in <u>Brown</u>, the ALJ clearly understood the limited extent to which Luke completed his activities of daily living, including specifically acknowledging that Luke reported he "attends [church] meetings once per week, alternating between sitting and standing as needed," tries to do some chores, but only "if he is feeling good" which happens only a few days per month, "has to lie down anywhere from an hour to up to four hours during the day," and that he "tries to socialize with friends . . . but . . . does not always feel up to it mentally or physically." R. 20. Further, unlike in <u>Brown</u>, the ALJ pointed to more than those daily activities to discount Luke's subjective allegations.[15] Beyond these activities of daily living, the ALJ noted that Luke's allegations were inconsistent with his medical records, including often negative findings on examination, conservative treatment, and large gaps in treatment. Luke's allegations of disability were also inconsistent with the conclusions of the state agency doctors and the

---

[15] Also, unlike in <u>Brown</u>, the ALJ here did not fail to consider any doctor's opinions, or wrongly credit a psychiatric medical expert's testimony over the "consistent opinions of [five] treating and examining sources" who found disabling physical limitations. <u>Brown</u>, 873 F.3d at 266.

18

consultative examiner. R. 24–25. Finally, the ALJ may properly rely on evidence regarding a plaintiff's routine, non-work activities in rejecting a claim of disability. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005).

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Luke's subjective complaints with substantial evidence, and that Luke is capable of performing work at the level stated in the ALJ's opinion.

## **CONCLUSION**

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Norman K. Moon, Senior United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as

well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

                                    Entered: February 3, 2021

*Robert S. Ballou*

                                    Robert S. Ballou
                                    United States Magistrate Judge