CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

3/24/2021
JULIA C. DUDLEY, CLERK
BY:   s/ A. Little
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

LUKE W.,[1]

                  *Plaintiff*,

v.

ANDREW SAUL, Commissioner of Social Security,

                  *Defendant*.

CASE NO. 6:19-cv-58

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

    The parties have filed cross motions for summary judgment, Dkts. 13, 15, which I referred to Magistrate Judge Robert S. Ballou ("Magistrate Judge") for proposed findings of fact and a recommended disposition. In his Report and Recommendation ("R&R"), the Magistrate Judge determined that the Commissioner's final decision was supported by substantial evidence and advised this Court to deny Luke's motion and grant the Commissioner's motion. Dkt. 19. Luke timely filed his objections, Dkt. 20, obligating this Court to undertake a *de novo* review of the R&R. *See* 28 U.S.C. § 636(b)(1)(C); *Farmer v. McBride*, 177 F. App'x 327, 330 (4th Cir. 2006).

## I.    STANDARD OF REVIEW

    Objections to a Magistrate Judge's R&R under Fed. R. Civ. P. 72(b) "train[] the attention of both the district court and the court of appeals upon only those issues that remain in dispute after the Magistrate Judge has made findings and recommendations." *United States v. Midgette*,

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts refer to claimants only by their first names and last initials.

478 F.3d 616, 621 (4th Cir. 2007) (citing *Thomas v. Arn*, 474 U.S. 140, 147–48 (1985)). The district court must determine *de novo* any portion of the Magistrate Judge's R&R to which a proper objection has been made. Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C); *Farmer*, 177 F. App'x at 330–31.

In conducting its review, this Court must affirm the Administrative Law Judge's ("ALJ") factual findings if they are supported by substantial evidence and were reached through application of the correct legal standard. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019); *Bird v. Comm'r of Soc. Sec.*, 669 F.3d 337, 340 (4th Cir. 2012). Substantial evidence requires more than a mere scintilla, but less than a preponderance, of evidence. *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). A finding is supported by substantial evidence if it is based on "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). The Court may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of the ALJ, *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012), and must defer to the ALJ's decision where "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," *Johnson*, 434 F.3d at 653. The ALJ need not discuss every piece of evidence, *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014), and the ALJ has the authority, and responsibility, to determine the weight to be given to a medical opinion in the record. *See Mastro*, 270 F.3d at 178.

Thus, even if the Court would have made contrary determinations of fact, it must nonetheless uphold the ALJ's decision, so long as it is supported by substantial evidence. *See Whiten v. Finch*, 437 F.2d 73, 74 (4th Cir. 1971).

## II.   BACKGROUND

### A.  The ALJ Decision

In May and November 2015, Luke filed claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Administrative Record ("R.") 209, 226, 229. He initially alleged that his disability began on April 1, 2012, but later amended the onset date to January 1, 2009, matching his SSI claim. R. 12, 201, 209. Luke claimed disability due to Crohn's disease, arthritis, anemia, depression, and attention deficit disorder ("ADD"). R. 209, 226, 229. In June 2018, the ALJ held a hearing to consider Luke's claims. R. 35–57. The ALJ concluded that Luke was not disabled. R. 12–29. Luke appealed his decision and the Appeals Council denied his request for review in July 2019. R. 1–4.

To determine whether Luke was disabled, the ALJ worked through a five-step process, considering, in sequence, whether Luke (1) was engaged in substantial gainful activity ("SGA")[2]; (2) had a severe medical impairment; (3) had an impairment listed or equivalent to one listed in the Social Security Act's ("the Act") regulations; (4) could return to his past relevant work based on his residual functional capacity ("RFC"); and, if he could not, whether (5) he could perform other work based on his RFC. 20 C.F.R. § 404.1520(a)(4); *see Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).

At step one, the ALJ found that Luke had not engaged in SGA since January 1, 2009, his alleged onset date. R. 19. Luke worked at a Domino's Pizza part time in 2011 and 2012, but that work did not rise to the level of SGA. *Id.* The ALJ then moved to step two and found that Luke

---

[2] "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b).

had "the following 'severe' impairments: Crohn's disease; inflammatory arthritis; anemia; ankylosing spondylitis/sacroiliitis; and mood disorder with possible attention deficit disorder." R. 20. Moving to step three, the ALJ found that Luke's severe impairments, considered alone or together, did not meet or medically equal the relevant listings in the Act. R. 20–23. The ALJ assessed Luke's RFC and found that he could "perform light work" where he is not required to more than "occasionally climb, balance, stoop, kneel, crouch, and crawl." R. 23. The ALJ also determined that Luke could not have "more than occasional exposure to extreme cold or hazards like hazardous machinery and unprotected heights." *Id.* The ALJ stated that Luke "can perform simple, routine tasks, in a job without strict production rate or pace requirements; and have not more than occasional interaction with coworkers." *Id.* But at step four, the ALJ noted that Luke had no past relevant work under the Act because "he did not perform any of [his previous] jobs at the level" of SGA. R. 32. At step five, the ALJ found that Luke could perform a significant number of jobs that exist in the national economy, specifically cleaner and marker.[3] R. 33. Because Luke failed to demonstrate that he has a disability, the ALJ concluded that Luke's claims for DIB and SSI should be denied. R.29.

### B.  The Magistrate Judge's R&R

The Magistrate Judge concluded that the Commissioner's final decision was supported by substantial evidence. In his motion for summary judgment, Luke had first contended that the ALJ "failed to properly assess his mental impairments as required by SSR 96-8P." Dkt. 19 at 6. The Magistrate Judge disagreed: finding substantial evidence supported the ALJ's finding that Luke

---

[3] A marker "[m]arks and attaches price tickets to articles of merchandise to record price and identifying information." Marker, Dictionary of Occupational Titles, DICOT 209.587-034 (G.P.O.), 1991 WL 671802 (1991).

could capably perform the basic mental demands of light work, with the specified accommodations; and that the ALJ adequately explained the phrase "a job without strict production rate or pace requirements." *Id.* at 8–9. The Magistrate Judge also determined that the ALJ adequately supported his finding that Luke could perform simple, routine tasks over a normal workday. *Id.* at 10–11. He found that the ALJ properly accounted for Luke's moderate impairments in the hypothetical questions to the vocational expert ("VE") and the RFC finding. *Id.* The Magistrate Judge also found that the ALJ properly explained how the RFC accommodates his moderate limitations in interacting with others. *See id.* at 11.

Luke had also argued that "the ALJ's physical RFC findings are not supported by substantial evidence." *Id.* at 12. Specifically, Luke asserted that the ALJ failed to account for "the unpredictable nature of his Crohn's disease, pain, and anemia." *Id.* However, the Magistrate Judge concluded that Luke's argument amounted to merely a disagreement with the ALJ's RFC determination because the record included specific findings that RFC limitations concerning pace and production requirements adequately accommodated Luke's need for bathroom breaks due to his gastrointestinal ("GI") symptoms. *Id.*

Additionally, Luke had argued that the ALJ's assessment of his subjective allegations is not supported by substantial evidence. *Id.* at 15. Again, the Magistrate Judge disagreed, noting that the ALJ discussed Luke's medical history and Luke's own testimony, and finding that the ALJ "carefully addressed Luke's allegations regarding his impairments." *Id.* at 17. Thus, the Magistrate Judge concluded that the ALJ supported his analysis of Luke's subjective complaints with substantial evidence.

# III.  ANALYSIS

## A. Assessment of Mental Impairments

Luke makes a number of objections to the ALJ's findings on mental impairments—each of which relate to his determinations at step 3. First, he argues that the ALJ failed to properly address his mental impairments, specifically that the ALJ erred in his conclusion that Luke could perform the "basic mental demands of light work, with the specified accommodations." Dkt. 20 at 1. Luke next argues that the ALJ failed to adequately explain the terms "no strict production rate or pace requirements," leaving unanswered the question regarding the amount of work expected to be accomplished throughout the day. *Id.* at 2. Luke then contends that the ALJ improperly relied on the opinions of Dr. Entin and Dr. Gardner when he found that Luke could sustain simple, routine tasks over a normal workday. *Id.* at 2–3. Luke also argues that the RFC did not address his moderate limitations in interacting with others.

### 1. Limitations in Concentration, Persistence, and Pace

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. *Teague v. Astrue*, No. 1:10-cv- 2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The narrative must describe "how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; *see Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often). And an "ALJ cannot summarily 'account

for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" *Shinaberry v. Saul*, 952 F.3d 113, 121 (4th Cir. 2020) (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015)).

There is no "categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." *Shinaberry*, 952 F.3d at 121. Instead, an ALJ need only "'explain why [a claimant's] moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation' in the claimant's RFC." *Id.* Moreover, *Mascio* underscores the ALJ's duty to adequately review the evidence and explain the decision. *See* 780 F.3d at 638.

There is substantial evidence to support the ALJ's findings that Luke's moderate limitations did not translate into the RFC. Contrary to Luke's argument that substantial evidence did not support the ALJ's conclusion that Luke could perform light work, the ALJ explicitly addressed why Luke's moderate mental limitations did not translate into a limitation in the RFC.[4] The ALJ considered the evidence in the record that Luke had moderate limitations in concentration, persistence and pace. The ALJ began by noting Luke's testimony about his variable concentration. He then mentioned evidence from Luke's former school psychologist, who found that Luke exhibited ADD-like symptoms. R. 17, 23. However, the ALJ then turned to conflicting evidence, which tended to show Luke had no such limitations. First, the ALJ noted that Luke's

---

[4] Mental disorders are evaluated using a five-point rating scale consisting of "none, mild, moderate, marked, and extreme limitation." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. A moderate limitation is defined as follows, "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." *Id.* Evaluations are based on the criteria outlined in Paragraph B which represent the areas of mental functioning a person uses in a work setting. *Id.* These included the ability to "understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id.*

2016 performance on cognitive tests revealed no attention difficulties. Next, the ALJ discussed how medical providers described Luke as "alert and oriented." R. 576. Finally, the ALJ discussed Luke's daily activities, and how they require *some* level of concentration (such as working, driving, doing chores, and playing video games). *See* R. 41–43, 48–49, 576, 712, 827, 829–30, 885. In other words, the ALJ considered the evidence for and against such limitations and found more substantial and persuasive the evidence that Luke had no such limitation, and the ALJ explained why he made that finding. R. 23. Thus, substantial evidence supports the ALJ's finding that Luke showed "no more than a 'moderate' limitation" in his ability to concentrate, persist, or maintain pace. The ALJ adequately explained why Luke's moderate mental limitations did not translate into limitations in the RFC.

   2.   ALJ's Explanation of "No Strict Production Rate or Pace Requirements"

The ALJ, while questioning the VE in front of Luke, said, "stress seems to be an issue, so let's eliminate those jobs that have strict production or pace requirements, whether that's keeping up with a factory assembly line or just being in a job where you have to make a certain number of objects every hour or every day." R. 55. The ALJ's statement provides enough context to permit meaningful review. *See Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019) (holding that a proper RFC requires a logical explanation in order to conduct "meaningful [] review"). This is not a circumstance where the ALJ entirely failed to explain the meaning of the phrase. *See Sharon H. v. Saul*, No. 3:18-cv-111, 2020 WL 6281610, at *3 (W.D. Va. Oct. 27, 2020). The ALJ provided information on the record explaining the phrase, providing examples such as a "factory assembly line" or a "job where you have to make a certain number of objects every hour or every day." R. 55. The VE responded by identifying jobs which were neither related to assembly lines or to positions requiring that a certain number of objects be made every hour or every day. R. 55. This

is not a circumstance where the VE's testimony contradicted the ALJ's statement or failed to shed light on the meaning of the phrase.

Thus, the Court finds that the ALJ adequately explained the phrase "no strict production rate or pace requirements."

### 3.   Accounting for Moderate Impairments

Luke argues that the ALJ erred in finding that he could sustain simple, routine tasks over a normal workday and failed to account for plaintiff's moderate impairments in his hypothetical questions to the VE and in his RFC findings.

The ALJ found that Luke had "no more than a 'moderate limitation'" in his ability to focus attention on work activities "and stay on task at a sustained rate."[5] R. 17. He further acknowledged that Luke had "mood-related and attentional symptoms" that could interfere with work activities. *Id.* However, the ALJ also determined that any limitations would not prevent Luke from performing "simple, routine task, in a job without strict production rate or pace requirements." *Id.*

Substantial evidence supported these findings. That evidence included Luke's testimony, Luke's childhood psychological evaluation, opinions of medical providers who examined Luke, and evidence of Luke's daily activities. For example, Luke testified that he had a "variable attention span" and that his concentration "depends on the situation," but that he is able to read the Bible and can "retain some things" when watching movies. R. 48–49. Luke also performed well on cognitive tests, which did not reveal any inattention issues. R. 829–30. Medical providers described him as being alert and oriented and did not note any unusual inattention issues or

---

[5] SSR 96-8p defines "sustained work activities on a regular and continuing basis" to mean the ability to perform work for "8 hours a day, for 5 days a week, or an equivalent work schedule." Sustained work activities describes the "maximum amount" of each work-related activity that the individual can perform based on the evidence in the record.

slowness. R. 576, 712, 827, 885. And Luke's daily activities included a history of part-time work, driving, doing chores, and playing video games. R. 41–43, 48, 712. The ALJ expressly considered all of these facts and incorporated them in his conclusion on the RFC. R. 25.

The ALJ also gave significant weight to testimony of consultative examiner Dr. Gardner, and some weight to the state agency psychologist, Dr. Entin, in determining Luke's RFC.[6] Dr. Gardner opined that Luke had the ability to "*complete* a normal workday or workweek without interruptions resulting from his psychiatric condition." R. 832 (emphasis added). And Dr. Entin stated that Luke "remains capable of . . . concentrating [and] persisting at work duties to completion." Dkt. 104. Luke argues that the ALJ's reliance on their opinions was misplaced because they did not explicitly opine that Luke could complete "sustained work activities" on a "regular and continuing basis." *See* SSR 96-8p (defining sustained work on a regular and continuing basis as "8 hours a day, for 5 days a week, or an equivalent work schedule"). Rather,

---

[6] Although Luke did not directly challenge the issue, the Court finds that the ALJ properly found that Dr. Gardner's opinion was entitled to "significant weight," and Dr. Entin's opinion only "some weight." Findings made by state agency consultants are entitled to weight if they are supported by evidence in the record. *See* SSR 96-6p. The ALJ found that Dr. Gardner's opinion was entitled to significant weight because his assessment was supported by other evidence. Specifically, Dr. Gardner found that Luke: (1) could drive himself 25 miles unaccompanied; (2) had normal gait and hygiene; (3) dressed appropriately; (4) responded normally in conversation; (5) was within normal limits for recent memory; and (6) had fair judgment. R. 827–32. These findings comported with other evidence in the record showing that Luke's doctors described him as alert and attentive and that Luke interacted with friends, went door to door for his church group, attended church meetings, and played video games. R. 41–43, 48, 576, 712, 827, 885.

The ALJ gave Dr. Entin some weight because his opinion was generally well supported by other evidence, but with some exceptions. While Dr. Entin had concluded that Luke is limited to performing "extremely routine procedures," R. 104, the ALJ found that opinion inconsistent with other evidence showing that Luke performed non-routine activities such as driving himself 25 miles to attend the consultative evaluation, attending church meetings, cooking, and spending time with friends, R. 26, 41–43, 48. And while Dr. Entin had concluded that Luke would be best suited for "positions with limited contact with the general public," R. 104, the ALJ found that opinion inconsistent with the evidence showing that Luke connected with the general public when he would go door to door to talk to people on behalf of his church, R. 43. For these reasons, the ALJ did not give more than some weight to Dr. Entin.

Luke argues that the experts opined only that he could physically be at work and complete a workday and workweek. He contends that this is distinct from his ability to stay on task and perform "sustained work activities."[7]

While there is a distinction between the ability to perform simple tasks and the ability to stay on task as Luke argues, that difference is not present here. *See Mascio*, 780 F.3d at 638. The experts adequately explained that Luke can perform sustained work activities. Indeed, Dr. Gardner stated that Luke could perform repetitive work tasks and "*complete* a normal workday or workweek without interruptions resulting from his psychiatric condition." R. 832 (emphasis added). And Dr. Entin stated that Luke "remains capable of . . . concentrating [and] persisting at work duties to completion." *Id.* Their opinions were more than conclusory. And both statements support the ALJ's finding that Luke could perform sustained work activities on a regular basis.

Thus, the Court finds substantial evidence supported the ALJ's determination that Luke could sustain his simple, routine tasks over a normal workday and that his moderate limitations were accounted for.

4. Moderate Limitations in Interacting with Others

The ALJ concluded in Luke's RFC that he can only occasionally interact with coworkers, but that he is not limited in his ability to interact with the general public. Luke argues that the RFC does not address his moderate limitations in interacting with others. Luke also argues that the ALJ

---

[7] Luke points to "*Beckner*," for such a proposition, but fails to provide any citation to the appropriate case or describe the rationale behind the distinction. Regardless, no reported opinion involving "Beckner" as a party appears to stand for such a proposition in this Circuit. *See Beckner v. Berryhill*, No. 7:16CV00307, 2017 WL 432826, at *1 (W.D. Va. Jan. 31, 2017); *Beckner v. Colvin*, 34 F. Supp. 3d 626 (W.D. Va. 2014); *Beckner v. Astrue*, No. 7:11-CV-00047, 2011 WL 5979786, at *1 (W.D. Va. Nov. 29, 2011). But even assuming the validity of that proposition, there is still substantial evidence supporting the ALJ's conclusion.

did not explain why he refused to adopt Dr. Entin's opinion that Luke could only have limited contact with the general public.

But again, ample evidence in the record supports the ALJ's decision. In determining Luke's RFC, the ALJ specifically accounted for Luke's testimony that he sometimes felt "out of place around other people . . . ." R. 23. The ALJ also took into account Luke's course of treatment, mental health status over time, and the fact that he spends some time with friends in person and electronically. R. 23–24. However, the ALJ also emphasized the evidence in the record that Luke was able to interact with the public, including that he regularly attended church meetings and shopped for groceries. The ALJ gave significant weight to the testimony of Dr. Gardner, who said Luke "would do best with minimal interactions with coworkers," but who did not find Luke could not interact with the public. R. 25.

To be sure, the ALJ did not credit Dr. Entin's testimony that Luke would "perform best in positions with limited contact with the general public." *Id.* However, the ALJ specifically addressed this opinion by Dr. Entin and explained why the totality of the evidence did not support such a finding. As discussed, Luke testified that he would go door-to-door to speak with people on behalf of his church, was capable (though noting he felt somewhat uncomfortable) of trips to the grocery store, and had friends he spoke with. R. 23, 41–43, 48, 712. The ALJ also noted that Luke "seemed more bothered by his interactions with [former] coworkers" than with the general public. R. 26. This is because while working at Domino's, Luke said he "got too involved with other people" and "it confused him" because his coworkers "expected too much" and "push[ed] [him] toward being the manager." R. 828.

Thus, there is substantial evidence to support the ALJ's conclusion in the RFC that Luke can only occasionally interact with coworkers, but that he is not limited in his ability to interact

with the general public. The ALJ's determination is also consistent with the jobs presented by the VE, maker and cleaner. R. 55. The VE specifically considered the ALJ's request that the job involves "no more than occasional interaction with coworkers." *Id.*

### B. Failure to Account for Physical Limitations

Luke contends that the ALJ did not (1) account for the unpredictable nature of his Crohn's disease, pain, and anemia, (2) make specific findings about whether his impairments would cause him to experience issues necessitating breaks and the frequency of those breaks, and (3) provide a narrative discussion that contains sufficient information to allow meaningful review by specifying how the limitations in the RFC correlate with his severe impairments.

As to the first point, there is no evidence in the record showing that Luke needs more breaks than provided by a standard employer on account of his Crohn's disease, pain, and anemia. Turning to the other two arguments, which can be taken together, an ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determinations. *See* SSR 96-8p; *see also Monroe*, 826 F.3d at 189. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869; *see also id.* at 866–68 (reversing and remanding where an ALJ failed to "build an accurate and logical bridge" from treating physicians' consistent medical opinions about the claimant's debilitating pain to his conclusion that those accounts should not be credited).

The record shows that the ALJ included a narrative discussion, with specific findings, which allows for meaningful review. Indeed, the ALJ provided a comprehensive analysis of Luke's medical records, medical opinions, Luke's own testimony, and the ALJ's conclusions. R. 19–27.

Substantial evidence supports the ALJ's finding that Luke's Crohn's disease presented some limitations, but not any that are disabling. In his narrative, the ALJ properly gave little weight to Luke's primary care provider, Dr. Steinwig, who wrote a letter stating that Luke's "Crohn's disease and related arthritis significantly limit [his] ability to work." R. 26, R. 399. As the ALJ explained, Dr. Steinwig's letter was not quantified or well supported. *See* R. 399. In fact, the letter seems in tension with the doctor's own treatment notes. *Compare* R. 399 (Dr. Steinwig's letter) *with* R. 395 (showing that during the same session where Dr. Steinwig wrote this letter he also described Luke's Crohn's disease as "stable," his arthritis as "much improved," his anemia as "improved," and finding "no inflamed joints" despite lumbar and cervical flexion pain). Additionally, the doctor did not attempt to explain any of Luke's work-related limitations. And significantly, the doctor wrote the letter after not seeing Luke for treatment in almost four years. R. 394.

Further, the ALJ noted in his findings that Luke's course of treatment is "not indicative of disabling GI symptoms." R. 22. Luke went years at a time receiving no medical care for his Crohn's disease. *Id.*  In fact, in 2016 he reported no GI symptoms and "stable" bowel pattern R. 713, 861. The only record of GI issues in late 2016 appear to be "one episode of diarrhea," after Luke strayed from his diet. R. 713, 849. Even when Luke sought medical care in 2015, he reported having bowel movements "once a day without blood." R. 394. To be sure, during that visit Luke reported having "unpredictable bad days" where he would have five to seven bowel movements, but there was no "pattern" to it. *Id.* However, there is no evidence then or elsewhere in the record showing the frequency to which Luke experienced these bad GI days and whether they persisted after May 2015.

14

There is substantial evidence presented in the record, and in the ALJ narrative, showing that between 2011 and 2018, Luke's GI symptoms were stable, as long as he watched his diet. R. 876. Moreover, the ALJ ensured in his questions to the VE that the jobs of cleaner and marker provide restroom breaks every "two hours or so." R. 55. Nor can Luke argue that the ALJ did not consider the collective impact of his limitations and symptoms. Indeed, the ALJ discussed all of the following limitations and how they related to each other: mental health, fatigue, GI symptoms, and joint pain. *See* R. 25 (discussing how Luke's mental health and GI symptoms impose additional limitations to his RFC with respect to pace and production requirements).

The ALJ provided details about how the RFC limitations interacted with his impairments. He explained the evidence before him, how he weighed the evidence, and, most importantly, *why* he weighed the evidence the way he did.

### C. Subjective Allegations

The final objection is that the ALJ did not explain how Luke's daily living showed that he was capable of completing a full workday. *See Brown v. Commissioner*, 873 F.3d 251(4th Cir. 2017) (explaining that an ALJ must acknowledge the extent of daily activities described by a claimant and explain how those activities demonstrate that the claimant could persist through an eight-hour workday).

The ALJ, after weighing the conflicting evidence and testimony, including Luke's testimony, found that Luke could complete a day of light work. The record shows that the ALJ acknowledged the extent of the activities mentioned by Luke. He recognized that Luke "attends [church] meetings once per week, alternating between sitting and standing as needed." R. 20. But he only feels good enough to do chores a few days per month. *Id.* The ALJ also mentioned Luke's testimony about how he "has to lie down anywhere from about an hour to up to four hours during

the day," and that he "tries to socialize with friends . . . but . . . does not always feel up to it mentally or physically." R. 20.

The record shows that the ALJ considered Luke's testimony and afforded it careful treatment. In addition to relying on Luke's testimony about his daily activities, the ALJ noted inconsistencies between Luke's allegations and his medical records. R. 24–25; *see* R. 41–43, 48, 712 (describing Luke's activities which include seeing friends, going door to door for his church group, attending church meetings, and playing video games). For instance, with respect to joint pain and inflammation, medical records from 2018 show that Luke reported that he had not had any major problems over the past few years. R. 876.  In 2016 Luke's doctors found his gait to be normal and an x-ray only found mild sclerosis, but they did not find any evidence of ankylosing spondylitis. R. 593. This was supported by their findings that Luke showed a good range of motion with no joint swelling or tenderness. R. 714. A 2018 physical exam also showed no tenderness and a normal range of motion. R. 877.

The ALJ also found inconsistencies between Luke's allegations and the state agency doctors' conclusions. R. 24–25. The state's physical consultant opined that Luke could perform demands of light work with some limitations. The state's consultant based this on findings similar to those in Luke's medical record described above. R. 97–101, 115–19. As it relates to his arthritis pain, Luke reported to Dr. Gardner, that while he has paint in all his joints, he estimated having "15 bad days and 15 good days in the last month," with the pain level on a bad day being "7 to an 8" and the pain on a good day being "1 to a 2." R. 828.

The ALJ was entitled to weigh Luke's credibility in consideration of the totality of the evidence. As described, substantial evidence supports the ALJ's finding considering the inconsistencies between Luke's testimony and his medical records and the opinions of state agency

doctors. *See* R. 24–25, 97–101, 115–19, 593, 714, 828, 876–77. The Court cannot disturb these determinations unless they are not supported by substantial evidence or they were reached by applying the wrong legal standard. Neither is the case here.

Finally, Luke incorrectly contends that the ALJ failed to consider the "waxing and waning" nature of his condition. Not so. The ALJ discussed the on-again, off-again nature of Luke's ongoing conditions and variable use of medications, finding that his overall course of treatment showed positive signs. R. 21–24. The ALJ, weighing the conflicting evidence, concluded that Luke was capable of completing an eight-hour workday subject to the limitations in the RFC.

Thus, the Court finds there is substantial evidence supporting the ALJ's findings as to Luke's subjective allegations.

## IV.   CONCLUSION

For the foregoing reasons, Luke's objections to the R&R will be overruled and the Court will adopt the R&R in full, Luke's motion for summary judgment will be denied, and the Commissioner's motion for summary judgment will be granted. An appropriate order will issue.

ENTERED this  24th  day of March 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE